The next matter on our calendar is Landau-Fletcher and the Secretary of Labor v. Convergex Group. You can raise the microphone, actually on the side of the podium, there's a button. Welcome to the Second Circuit. Thank you, Your Honors. May it please the Court, my name is James Moore and I represent Plaintiff Appellant Landau-Fletcher. Plaintiff Fletcher has brought an ERISA civil enforcement action on behalf of his plan to remedy harm to his employee pension plan caused by defendant securities brokers. Defendants are ERISA fiduciaries and they perpetrated a scheme against Plaintiff's plan as well as hundreds of other plans across the country through which they double charged for securities transactions made on behalf of those plans. Self-dealing. Correct. And several of the defendants have already admitted to the truth of these allegations with the U.S. Department of Justice and the U.S. Securities and Exchange Commission. And Plaintiff Fletcher also brings this suit as a class action on behalf of named fiduciaries, participants, and beneficiaries of all the ERISA employee benefit plans that were affected by defendant's scheme. Do we need to talk about the individual standing? Or do you concede that the district court got it right when he said it was de minimis? That is the loss to Mr. Fletcher himself. Well, we believe that Plaintiff Fletcher has standing on two independent grounds. But the individualized harm, are you prepared to concede that the district court got it right? No, we are not. But our primary argument is that he has representative standing on behalf of his plan. I understand that. But are you also arguing for individualized standing? Yes. We believe Plaintiff Fletcher has individualized standing in two respects. One, insofar as his statutory right to have a plan that's free of fiduciary self-dealing was invaded. And in terms of the individual pecuniary harm to himself. The question is, if you were to prevail on representative standing, would we have to deal with the individual standing issue? No, Your Honor, because there's no dispute that the plan was harmed in this case because defendants effectively stole. We could ally the somewhat thornier issue of individual standing and move right to the representative standing if you were to prevail on that issue. Correct, Your Honor. And that's exactly what, in a subsequent decision, Judge Schofield of the Southern District did in a case with essentially the same facts. She found that this court's previous decision in Long Island had start, which recognized representative standing for planned participants to sue for her office. Why don't you focus on representative standing? I'd be glad to, Your Honor. As I was saying, we believe that issue has already been decided by this court in the Long Island Head Start case. And Judge Schofield agreed with that interpretation in a case we've submitted as subsequent authority. She found that that case had decided this issue. And it should also be noted that the decision in Long Island Head Start was solidly grounded in the law. As the Supreme Court held in Sprint and more recently in Spokio, federal courts should be guided in the statutory context in terms of determining the scope of Article III standing by two factors, congressional intent and history. And both those factors support recognizing representative standing for ERISA plaintiffs. With respect to congressional intent, the language of ERISA makes clear that participants have the right to bring suit on behalf of their plan to remedy harm to their plan. ERISA's civil enforcement provision with respect to fiduciary breaches, which is 29 U.S.C. section 1132A2, provides that a civil action may be brought, quote, by the secretary or by a participant, beneficiary, or fiduciary for appropriate relief, close quote, under ERISA's provision making fiduciaries liable for ERISA violations, which is section 1109. And that section permits those entities just listed to seek relief making good to the, quote, plan, any losses to the plan resulting from each such breach, close quote. So the fact that that section authorizes participants to recover losses to the plan as a whole makes clear that. When you refer to losses, does that also include the risk of loss to a plan? I don't think I would argue that. I'm not sure I would argue that in this case, but it's not an issue under this fact scenario because it's undisputed that there's an actual loss to the plan. This is the 1577. Correct. That's the amount of the loss to the plan. That's what we have been able to establish so far. Correct. Which came about by a breach of the fiduciary duty. Correct. By the double charging scheme. Right. And it should be noted that this is exactly the kind of breach that ERISA was designed and enacted to give participants a remedy to correct. I mean, the reason ERISA was enacted was because there was a chronic problem with fiduciaries raiding the company pension plan to either enrich themselves or to make use of the pension plan assets for corporate purposes. Here we have just that case. The fiduciaries have, in effect, been stealing from the pension plan, and Plaintiff Fletcher is bringing suit to remedy that theft. But the district court here didn't even consider the issues of representative standing. It didn't even mention in the opinion of the Long Island Head Start case. It said, sorry, Plaintiff Fletcher, you don't have standing to bring suit, even though these fiduciaries are stealing from your employee pension plan. In addition to congressional intent, through the plain language of the statute being clear, that participants have representative standing, history also supports recognizing representative standing for ERISA participants. The Supreme Court, in its sprint decision, recognized that federal courts have, quote, routinely entertained, close quote, suits involving representative standing. And one of the examples it cited was suits bought by trustees to benefit their trusts. And that's significant for interpreting ERISA because the Supreme Court has also repeatedly recognized that ERISA, in effect, codifies trust law, and trust law is to be used as a basis for interpreting ERISA. Is it correct that the Third, Fourth, Sixth, Eighth, and Ninth circuits have all concluded that plan participants have got to show some individual injury in order to bring claims in a representative capacity? Well, many of those decisions are factually distinguishable. I understand. Distinguishable from this case. Yes, but as a matter of the holding, whether or not they're factually distinguishable, is that correct? Well, only three of those decisions involved employee pension plans. The other ones involved welfare plans or health plans. With respect to the ones that involve the employee plans, is that correct? I believe you could argue that that is the case. Let me flip it then. Is there a circuit out there that has concluded that plan participants do not have to show individual injury, in fact, in order to bring a representative capacity claim? Yes, Your Honor, this circuit has, and Long Island has. Well, that's your ultimate point. All right. So you say we're bound by Long Island health? Yes, and that position is also supported by the Secretary of Labor. I should point out that in a couple of recent Supreme Court cases, the Supreme Court has unanimously resolved circuit splits on a range of issues in favor of the position adopted by the Secretary of Labor. That was in the ---- And Judge Pooler used the term de minimis in describing or in asking a question about the injury here. So it's three-fourths of one cent per individual. Is that correct? Something less than a cent was the injury ascribed to the self-dealing and to each participant. Is that correct? I have not bothered to verify the accuracy of the district court's calculations, but I believe that was ---- That's what Judge Stanton said. Is that correct? Pardon me? That's what the judge said. I believe that. Okay. Is there a case that suggests that that is not de minimis as a matter of constitutional standing? The scrap case, SCRAP, the Supreme Court case, which has the famous quote that an identifiable trifle is sufficient for standing. This court has also had numerous cases indicating that the amount of an economic loss is not relevant to determining whether an injury is sufficient for standing. And if my memory serves, I believe the injury in the SCRAP case was something on the order of two cents. Well, your time has expired. You have retained two minutes for rebuttal. Thank you, Your Honor. Thank you. We'll hear from the Secretary. Good morning, Your Honor. May it please the Court, Mark Serrato on behalf of the Secretary of Labor. As you've heard from appellants counsel, the issue of the defendant's self-dealing scheme is not in dispute. The issue that the plan has suffered a harm, albeit a small harm of $1,577, is also not in dispute. The Secretary supports that the defendants have Article III standing in two ways, and the individualized standing and also the representational standing. And perhaps we should – Plaintiffs, sir. I'm sorry, Your Honor. Plaintiffs have Article III. The participants of the plan. Yes, that's correct. I'm sorry if I misspoke. Perhaps we should address the representational standing argument first. And in this circuit, I think if we look at Cohn v. Kaufman, this Court has acknowledged that representational standing exists for participants to bring a cause of action on behalf of a plan. I think Donahue v. Bulldog also supports this. And Donahue lays out what the requirements are, what the analysis is. And just to remind the Court, the Article III analysis of injury is done at the plan level. And whether or not a participant has the analysis of the participant's interest in the plan is not an Article III standing analysis. Although here we're talking about individual standing. We're looking for injury in fact. Well, that's correct, Your Honor. If you'd like me to go directly to the individual standing, I'm happy to do that. I was talking about the representational standing of the individual on behalf of only his plan. I was not addressing the class plan. I think the more problematic issue is the individual standing. Personally, that's what I think. I'm happy to look at that, Your Honor. In terms of the individualized standing, I think if this Court has spoken on this issue in 1992 with financial institutions, in that case this Court said that alleging the invasion and the deprivation of a specific right under ERISA, a fiduciary breach, in that case it was a 404 fiduciary breach, was sufficient for injury in fact for Article III standing. Subsequently, we have Kendall, which approvingly cites that and says that the Kendall plaintiff wasn't specific enough. You cannot walk into court and say my plan isn't compliant with ERISA, but I'm not going to plead specific ways in which that's the case. We've had a recent decision in Ivey, and we think that the three of those cases can be read together. The Kendall plaintiff alleged my plan isn't compliant with ERISA, but also tried to plead specific damages but did not allege sufficient facts to establish that she had a right to some funds. She was pleading on behalf of a hypothetical participant, and the Court said that's not sufficient. And we think that Ivey can be read in the same way, which is that— Of course, in Ivey the distinguishing fact was that the plans didn't lose anything. They made money. That's right. That's right. And so the damages, the cause of action that was alleged was illusory and not one recognized under law, and therefore there was no injury in fact that was able to be pled because there was no allegation of a deprivation of a specific right. They looked right to these illusory profits when, in fact, they had no right to these profits under the law. Do you think that Mr. Fletcher, based on Fellick, can also represent members of other plans? The Secretary and the Department are not taking a position on that in this case, Your Honor. All right. Our brief and our arguments are centered entirely on the Article III standing issues, on the individualized standing and on the representational standing. And I'd like to move back to the representational standing issue for just a moment, if I could, that the question earlier about whether or not reaching that issue would be sufficient and you would not have to reach the financial institutions, Kendall, Ivey issue, the Secretary agrees that that's the case, but we think that the reading of those cases is clear and that the circuit split that's been alluded to has already been in existence since 1992, that financial institutions has been the law in this case for several decades. I'm sorry, the what? That the circuit split is not a making of a decision that would be handed down as a result of the Fletcher case, that it already exists to the extent that financial institutions held that the assertion of a deprivation of a specific right under ERISA is sufficient to support Article III standing, that that's been the law since 1992. So beyond the mere assertion of a breach of fiduciary duty, there's got to be a more specific assertion? It has to be specific. Yes, that's correct, Your Honor. And the specific assertion here is what? Self-deal? What is it exactly? It's self-dealing under ERISA Section 406. That's right. The right to have your fiduciary not look to not pay himself first. That's correct. And I believe I'm out of time. Counsel, I'm glad you got your funding and you could appear here. We're all glad about that. Thank you. Good morning. May it please the Court. My name is Melissa Hill, and I'm here on behalf of the Convergex defendants, or appellees, in this matter. Plaintiff brings this putative class action lawsuit to recover $1,577 to his plan. He has not been harmed by the defendant's alleged conduct in any way, and nor is there any chance that he will be harmed by the defendant's alleged conduct. And that's something that Judge Stanton correctly found. I'm happy to talk about the individualized nature of the injury or the lack thereof. Why is there no chance of harm given the MPRA? Given, I'm sorry? The MPRA. I mean, there's – I take it that you say you're suggesting that there's no chance of harm because it's guaranteed that he will be – he will receive his benefits? Why is there no chance of harm? That's the question. There's no chance that he's going to be harmed by the defendant's conduct here. And that the district court correctly found. And that, I think, is Your Honor's point, that we're only talking about three-quarters of a cent per participant here that could actually affect Mr. Fletcher. And I think it's important that we frame what Mr. Fletcher's interest is in this litigation. Article III says before somebody comes in the door to an Article III court, they have to have a stake in the litigation. They have to have suffered an injury that can be redressed by this court that was caused by the harm that they're alleging. And here, Mr. Fletcher's injury – or, I'm sorry, Mr. Fletcher's benefit, the interest that he has in this litigation, as we know from the Supreme Court's decision in Hughes Aircraft, is in his defined benefit under a defined benefit pension plan. He has a right to only that. He does not have a right to the plan assets, to the general pool of assets held in the defined benefit plan. He does not have a right to any plan surplus, nor does he have a right to police the management of plan assets if it doesn't impact his individual benefit. Your position is that three-quarters of a cent is not sufficient? Your Honor, his benefit will not be diminished by three-quarters of a cent. That was the district court's calculation of, I would suggest, causation. So to take the $1,577 and spread it across the 400,000 participants in the plan – There's no – there's no diminution of his benefit that he has. There's not. Mr. Fletcher will receive his benefit. The plan is woefully underfunded. That's correct, Your Honor. It's certainly not because of the $1,577 or anything that the defendants are alleged to have done here. And in – Is it your position that the self-dealing in that amount contributed not at all to an increase in the risk of insolvency? Your Honor, I would agree with Judge Stanton that it is so minute as to be imaginary. So, yes. And what we would have to look at there, the 1,500 – so – Zero – as a mathematical proposition, zero increase in the risk of insolvency as a result of the self-dealing. I think the risk of insolvency is the percentage that Judge – the risk of increase in the risk of insolvency is the percentage that Judge Stanton calculated, which is some fraction of a hundredth of a percent. And that is not enough to satisfy Article III's requirements, which require actual and imminent injury. What would be enough down at that range? Well, Your Honor, fortunately, that's not the question. Because that's sort of what we have to think about. It is. Of course it is. And I think one could imagine a scenario where the alleged harm may actually increase the plan's risk of default or enhance the plan's risk of default, which the Supreme Court in LaRue told courts to look to in a defined benefit context. What if you had a situation where there was some self-dealing and you sort of had – you had an up and you had a down and they balanced off at the percentage that Judge Stanton calculated? Sure. I think you need to look at the individual circumstances there or the particularized nature of whatever the harm is alleged there. Whatever the self-dealing is. Whatever the self-dealing is, whether it's continuing with the funded status of the plan was before, whether there is – I think you can envision, for example, I think this was some of the allegations in Long Island Head Start, which if it could be found to have an injury there, the allegations are that there was – the fiduciaries were failing to recover liability from withdrawing employers and they were doing that as a matter of practice and they were not seeking to recover these delinquent contributions from the employers who were withdrawing from this multi-employer welfare plan. And if a fiduciary continued to do that over time, I think you could see how it might go from overfunded one day to underfunded the next and then to significantly underfunded if that conduct continued. That is just not the situation that we're faced with here. I think we could posit one where such an inevitability might be – or the risk of that loss might be imminent enough or not speculative or not hypothetical, but here we're not dealing with that. The loss that would have to be caused by this $1,577 is just purely conjecture here. And that's not what Article III allows to go forward. Would you talk about representational standing? Absolutely. It is correct that the circuits – that the Third, Fourth, Sixth, and Eighth – Eighth and Ninth Circuits have all rejected this representational standing doctrine. And I would also submit that the Fifth Circuit has now joined those circuits in the Lee v. Verizon case applying Spokio in this context. The Fifth Circuit there was presented with the same arguments under Vermont agency and under Sprint Communications related to the assignor's right to – or the assignee's right to bring an action in its representational standing and said that doesn't apply to ERISA. The long history of assignment does not apply to ERISA. This is not what we're talking about here. And I would actually suggest that the Second Circuit is also among the circuits that have rejected that notion. Although they haven't called it that, they've rejected that notion. If you look at the Second Circuit's decision in Taveras v. UBS, which Judge Stanton cited and which relies on Judge Hall's opinion in Kendall, says exactly that, and even though they don't call it representational standing. Did the participants in Taveras exercise some discretion? And that's quite a change from Long Island Head Start. I'm sorry, I didn't understand your question. Did they exercise some control over the investments in Taveras? Did the fiduciaries there or did the participants there? The individual participants. It was a different type of plan, yes, and it was an employee stock ownership plan, so I think that speaks to whether there's an individualized inquiry. But as it relates to the representational standing question, Taveras specifically found, and I'll quote, and this was the quote from Judge Stanton's decision, an ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan, but not individualized injury to the plan participant. That's exactly what we have here. And that's not consistent with Plaintiff's reading of Long Island Head Start, and that does not suggest a circuit split. If anything, that suggests that Taveras read Long Island Head Start in the footnote and then said, no, when we have a plan, even if the plan has been injured, if the participant has not suffered an individualized inquiry, that participant lacks standing to sue, and that's exactly what we're dealing with here. So I don't believe that there's a circuit split, and I don't believe that Long Island Head Start should be read as Plaintiffs and the Department suggests it should. But of course, the Department asks us to read three cases, I guess, in tandem, and maybe a few more, but Donahue, Kendall, plus Bulldog, and Donahue refers to the short-swing profits issue as analogous. So what do you make of that argument? Sure. Donahue v. Bulldog is the Section 16b case under the Exchange Act. I think Donahue v. Bulldog is actually somewhat instructive here because it says if you're looking at whether or not an individual has been injured and whether an individual has right to sue for this injury, whether it's in the representational derivative capacity, you look at the statute that he or she is suing under and the particular rights that are conferred there and the rights that are implicated there. And in Section 16b, an issuer's right or interest in the profits of short-swing trading, that's what that is the issue at — that's what was at issue, I'm sorry, in Donahue v. Bulldog. That's not what we have going on here. Can I ask my Taveras question? Yes. And I'll try to be more articulate. In Taveras, the participants decided where the funds would be placed. And therefore, the overall loss of the plan would not affect individuals. They were responsible for that. Isn't that a difference between Taveras and Long Island Head Start? Yes, it is on the individualized inquiry component. Well, actually, I'm sorry, Your Honor. It's not an — Long Island Head Start is equally distinguishable because Long Island Head Start was an employee welfare plan. So we're talking about very different interests at stake when we're talking about a welfare benefit plan and the defined benefit plan that's at interest here in the Fletcher case. The Central States plan that we're talking about is a defined benefit plan. The Long Island — the plan at issue in the Long Island Head Start case was a welfare plan. And those are very different types. And the rights of the participants in those different plans are different. And that's what Donahue suggests we must look to. In fact, that's what Spokio says we must look to, is what rights are implicated, what individuals' rights are implicated. And here, Mr. Fletcher's interest is only in the benefit stream that the statute — that the pension plan affords him. In a defined benefit pension plan, it's different than, as Your Honor suggests, in the plan — in the employee stock ownership plan, that was the interest in Taveras and whether or not — and the question there, as it relates to an individualized inquiry, looked at what that — what those participants' rights were. And there, it was — it was dependent on where they invested their money. Sotomayor. Who could sue under your scenario? A fiduciary. A fiduciary certainly could. And — and plaintiffs implicitly conceded that they would need a fiduciary to bring a claim like this, where Mr. Fletcher himself as a participant was not impacted. When we first — when plaintiffs first filed their complaint, Mr. Fletcher was the only plaintiff on behalf of the Central States plan with $1,577 was all the plan was plaintiffs. After our first motion to dismiss, which raised all the arguments that are before the Court right now, plaintiffs amended their complaint and added claims for — on behalf of another plaintiff who was a fiduciary to another plan, the Teamster's local plan. That's an implicit concession that they needed a fiduciary to bring — to remedy these — to remedy these harms to the extent they occurred. Discovery panned out, as it related to Mr. Potter's claim, that was the added plaintiff and the Teamster's local plan. And, in fact, there were no — Those are the fiduciary. Mr. Potter was the fiduciary of his Teamster's plan. So we — so Discovery played out, and as it turned out, Mr. Potter's Teamster's local plan was not impacted at all by this alleged self-dealing scheme. His plan was not even touched. And so he had no claim at all, and neither did his plan. Now I'm a little confused. Sure. Not because of anything you said. It's because of maybe some misunderstanding that I've had. Just Stanton seemed to ascribe significance to the fact that the loss associated with — the individual loss, potentially, associated with this self-dealing was less — some fractional proportion of one cent, right? If it had been three cents, would you — would you agree then that there was some injury? Your Honor, I would — I would look to two things. The first is Article III's standard of what injury is, and I don't think three cents reaches that. But I do think Judge Stanton was looking at the causation component there. And the harm — But he doesn't, of course, describe it as that. He describes it as the injury in fact. So — I think he does. I think he does, because what he says, I believe, is that he looks — he looks to that and says this speculative reduction or nonpayment is not attributable to the overcharges, and notes there that the 1,577 spread across 400,000 planned participants is less than a — Attributable, you say, is really a matter of causation. That is where he's drawing on that — on Article III's second requirement. And why I would say that — And so your view is that there is no injury really because no matter what, notwithstanding the lack of any guarantee after the MPRA, Mr. Fletcher, is that his name, is going to get his full benefit? Well — What is your view? I'm trying to understand your view. Sure. Hughes Aircraft tells us Mr. Fletcher's right is to his benefit, his monthly benefit when he retires. And then the question that this Court must ask to determine whether he has suffered an individualized, particularized concrete injury that we know we need now in the wake of Spokio and Lee v. Verizon is whether that benefit — not his plan's assets. He has no interest in the plan's assets unless some harm to the plan affects his benefit. And those are two entirely different things. So what happens with the investment of his assets is not necessarily going to impact his benefit. He gets the benefit stream. That's what Hughes Aircraft says and that's what LaRue says. And unless his benefit stream is violated, and we know that he has not been denied any benefit, we — What if his — what if there is a risk, enhanced risk? That's exactly the question that the Court has to ask. And so it's a particularized inquiry into the circumstances surrounding Mr. Fletcher and his benefit. And there's a lot of factors that the Court would have to consider. Judge Stanton found that the $1,577 in the face of 400,000 participants and a $16 billion underfunding could not plausibly be the cause of any risk to his pension benefit being denied. And if that number instead of — Or reduced. Or reduced. If that number instead of $1,577 was — let's say it was $15 billion and therefore might bring the plan closer to solvency, you still would need to look at the particular circumstances surrounding Mr. Fletcher and surrounding his plan. There are variables that will dictate whether or not — that are not before the Court right now, but that will determine whether or not Mr. Fletcher gets his benefit or not. The first is his age. Plaintiffs have not alleged how old Mr. Fletcher is. If Mr. Fletcher — I believe he might be in his early 60s. If he's approaching retirement and if he's slated to start receiving a pension benefit next year, it's almost certain that he'll get that benefit. The plan is still paying benefits. It might be in trouble down the line, but it's still paying benefits now. So if Mr. Fletcher goes into retirement next year and lives for another 10 years, he might not lose a penny. And that's something that the Court would have to consider if those facts were before it. Similarly, interest rates dictate a plan's funding status. And interest rates might go up soon. And if they do, the interest rate that's applied to the actuarial calculations and to the plan's assets and the discount rates that's applied to the plan's assets then dictates the funded status. And it might go from $16 billion to something less than that. The economy should shift. It could shift. And its assets could perform better. All of those are variables that are not before this Court and need not be before this Court because, as the district court correctly found, there's just no plausible way that the $1,577 could cause any injury to Mr. Fletcher when his only right here is to his defined benefit, which is not at risk because of defendant's conduct. Thank you. Thank you, Your Honor. Mr. Moore, you have two minutes for rebuttal. Thank you, Your Honor. One thing I would like to emphasize is that all the other circuit court decisions that have addressed the standing of defined benefit plan participants, with one exception, have involved overfunded pension plans. This is a severely underfunded one. So what? Well, if you read those opinions, the focus of those opinions was on the notion that if the plan's already overfunded, how can you be harmed if there was imprudent investment that only affected, you know, tens of thousands of dollars and wouldn't have endangered your pension benefits. The only exception to that is the Fifth Circuit's decision, and that's an unpublished decision. So I just want to point out that in terms of a circuit split, we could argue that there is no circuit split with respect to underfunded plans such as we have in this instance. In addition, I wanted to emphasize that if you read those other opinions, they never really focus on one problem with their holding, and that is that ERISA makes no distinction between fiduciaries and participants when it comes to giving them capacity to bring suit on behalf of their pension plan. And my distinguished opponent here has conceded that fiduciaries have that capacity. But those opinions never explain why fiduciaries have that capacity, and ERISA makes no distinction between fiduciaries and participants, why participants don't have that capacity as well. And I should add that we certainly do not. You're saying that as a matter of the text, there is no distinction whatsoever in the context, I guess, of 1132 between fiduciaries and participants. Correct. Yes. Plain text reading. Yes. It says the civil action may be wrought, quote, by the secretary or by a participant, beneficiary, or fiduciary for appropriate relief under ERISA's fiduciary enforcement section. So what's good for fiduciaries is good for participants as a matter of standing. Correct. They both have an interest in the integrity of their employee benefit plans. And I should note that history supports giving both capacity to sue on behalf of their plans. As I was saying previously, the Supreme Court in Sprint recognized that trustees have capacity to bring suit on behalf of their plans. I'm sorry, I didn't mean to interrupt. And in the more precise trust law analog of this case, in which a beneficiary would be bringing suit to benefit his or her trust, history also provides, makes clear that beneficiaries have standing to bring suit to benefit their trust, even when they have not personally suffered an economic harm. And the Seventh Circuit in the Scanlon v. Eisenberg case held exactly that. It reversed a district court that had dismissed, for lack of our Uncle Three standing, a beneficiary who sought to bring a suit to benefit her trust, even though it was agreed that the harm to the trust would not endanger the trust's ability to pay the beneficiary's distributions. And it found that she had that standing because, quote, she had a protected interest in the prudent and loyal administration of the trust, and she had alleged an invasion of that interest. Counsel, would you just take a minute and explain your claim that Mr. Fletcher can also represent other plans based on Felleck, I think is the case, the Sixth Circuit? I'd be happy to, Your Honor. Because the gravamen of his challenge is the same as the other to the other plans? He's making the same challenge to both, to all the plans that were served by Convergex? Sorry, were you asking me a question? I'm asking you if that is your argument, or explain the claim that he can represent plans of which he was not a participant. Well, we interpret the district court's holding in this respect as a holding that Plaintiff Fletcher, in order to bring a class action, needs to have statutory standing not only to bring his claim, but also to bring the claim of other class members. Even if he's not a member of the other plans? I'm just describing the district court's holding here. That's what it seemed to have held, that Plaintiff Fletcher would also, in order to bring a class action, would also have to be a member of all the other plans. But the Supreme Court has repeatedly held that class actions are simply a species of traditional joinder, in which multiple claims are joined together as one. And in the case of traditional joinder, each plaintiff bringing the claim has to satisfy the jurisdictional and standing requirements to bring that claim. And in this case, Plaintiff Fletcher has met that requirement with respect to his claim. He is a member of his plan, and he's bringing his claim on behalf of his plan. And it's the individual class members who have to satisfy the standing requirements for their claim. And included in the class are participants and named fiduciaries of each of the plans affected. So statutory standing requirements are satisfied with respect to all the claims joined in the case. And there's nothing in Rule 23 or ERISA that requires anything more. Thank you. Thank you. We'll reserve decision. We ordinarily don't allow so replies, but take a minute. Only because it didn't come up in the first piece of his argument, Your Honor. Thank you. But it was in the plaintiff's brief. I'm sorry? But it was in the plaintiff's brief. Sure, of course. And I just wanted to respond to one comment, two comments that Mr. — that counsel made with respect to the distinction between a fiduciary and a participant as it relates to the text of ERISA and then its implications and the trustful implications here. While the statutory provision giving participants, beneficiaries, and fiduciaries a cause of action to bring suit may not make a distinction between participants and fiduciaries, the statute itself certainly does, as does the case law. Fiduciaries have a very different interest and, in fact, an obligation in the management of plan assets and to oversee the plan assets. Fiduciaries don't have a right to a pension benefit like Mr. Fletcher does, like a participant does. Instead, they have an obligation to adhere to their duties that are set out in the statute. So to suggest that there's no distinction in the statute between a participant and a fiduciary is just not correct. All right. Thank you. Thank you.